MICHAEL JAY GREEN AND ASSOCIATES, INC.
MICHAEL JAY GREEN      4451
michaeljgreen@hawaii.rr.com
*- AND -*
LAW OFFICE OF PETER C. HSIEH
PETER C. HSIEH      3204
hsiehp002@hawaii.rr.com
Davies Pacific Center
841 Bishop Street, Suite 2201
Honolulu, Hawaii  96813
Telephone:  (808) 521-3336
Facsimile:  (808) 566-0347

Attorneys for Plaintiff
JOSEPH H. CAMPOS, II

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH H. CAMPOS II,<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF HAWAII, as body corporation, ANDREW W. NICHOLS, M.D., individually and in his official capacity as Director of University Health Services Manoa, JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE GOVERNMENTAL ENTITIES 1-10,<br><br>Defendants. | CIVIL NO. _____<br><br>COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |

<u>COMPLAINT</u>

Plaintiff JOSEPH H. CAMPOS II ("Plaintiff"), by and through his attorneys, Michael Jay Green and Peter C. Hsieh, for a complaint against the above-named Defendants, alleges and avers as follows:

<u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction of the claims against Defendants pursuant to 28 U.S.C. §§ 1331 and 1367 and supplemental jurisdiction of Plaintiff's state claims against Defendants.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (1) the defendants are residents of the State in this district and (2) a substantial part of the events or omissions giving rise to Plaintiff's injuries and claims occurred in this judicial district.

<u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

3.      On June 18, 2019, the U.S. Equal Employment Opportunity Commission ("EEOC") issued a Dismissal and Notice of Rights and Notice of Suit Rights to Plaintiff in *Joseph H. Campos vs. University of Hawaii at Manoa*, FEPA No. 19219 and EEOC No. 37B-2016-00221 ("EEOC Notice"), giving him right to file a lawsuit against the University of Hawaii at Manoa under federal law in the

appropriate court within 90 days of his receipt of the EEOC Notice.  Plaintiff received the EEOC Notice on June 25, 2019.

4.     On May 14, 2019, the Hawaii Civil Rights Commission ("HCRC") issued a Dismissal and Notice of Rights and Notice of Suit Rights to Plaintiff in *Joseph H. Campos vs. University of Hawaii at Manoa*, FEPA No. 19219 and EEOC No. 37B-2016-00221 ("HCRC Notice"), giving him right to file a lawsuit against the University of Hawaii at Manoa under federal law in federal or state court within 90 days of his receipt of the HCRC Notice.  Plaintiff received the HCRC Notice on May 16, 2019.

5.     On June 18, 2019, the EEOC issued a Dismissal and Notice of Rights and Notice of Suit Rights to Plaintiff in *Joseph H. Campos vs. University of Hawaii at Manoa*, FEPA No. 19795 and EEOC No. 37B-2017-00275 ("EEOC Notice"), giving him right to file a lawsuit against the University of Hawaii at Manoa under federal law in the appropriate court within 90 days of his receipt of the EEOC Notice.  Plaintiff received the EEOC Notice on June 25, 2019.

6.     On June 17, 2019, the HCRC issued a Dismissal and Notice of Rights and Notice of Suit Rights to Plaintiff in *Joseph H. Campos vs. University of Hawaii at Manoa*, FEPA No. 19795 and EEOC No. 37B-2017-00275 ("HCRC Notice"), giving him right to file a lawsuit against the University of Hawaii at Manoa

under federal law in federal or state court within 90 days of his receipt of the EEOC Notice.  Plaintiff received the HCRC on June 18, 2019.

7.     On June 18, 2019, the EEOC issued a Dismissal and Notice of Rights and Notice of Suit Rights to Plaintiff in *Joseph H. Campos vs. University of Hawaii at Manoa*, Agency Charge No(s): 486-2018-00529 ("EEOC Notice"), giving him right to file a lawsuit against the University of Hawaii at Manoa under federal law in the appropriate court within 90 days of his receipt of the EEOC Notice. Plaintiff received the EEOC Notice on June 25, 2019.

8.     On June 17, 2019, the HCRC issued a Dismissal and Notice of Rights and Notice of Suit Rights to Plaintiff in *Joseph H. Campos vs. University of Hawaii at Manoa*, Agency Charge No(s): 486-2018-00529 ("HCRC Notice"), giving him right to file a lawsuit against the University of Hawaii at Manoa under federal law in state court within 90 days of his receipt of the HCRC Notice.  Plaintiff received the HCRC Notice on June 18, 2019.

## PARTIES

9.     Plaintiff JOSEPH H. CAMPOS II ("Plaintiff") is, and was at all relevant times herein, a resident of City and County of Honolulu, State of Hawaii, and a citizen of the United States of America.

4

10.     Defendant UNIVERSITY OF HAWAII ("Employer" or "UH"), is, and was at all relevant times herein, a public body and a body corporate and politic of the State of Hawaii.

11.     Defendant ANDREW W. NICHOLS, M.D. ("Dr. Nichols"), individually and in his official capacity as Director of University Health Services Manoa, is, and was at all relevant times herein, a resident of City and County of Honolulu, State of Hawaii, and a citizen of the United States of America.

12.     Defendants JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE GOVERNMENTAL ENTITIES 1-10 are sued herein under fictitious names for the reason that their true names, capacities and responsibilities are presently unknown to the Plaintiff, but upon information and belief they are persons, entities, governmental agencies, and/or partnerships who were in some manner presently unknown to the Plaintiff engaged in the activities alleged herein; and/or are in some manner responsible for the injuries and damages to the Plaintiff; and/or are persons who conducted some activity in a negligent, wrongful, and/or willful manner or who failed to fulfill a duty or obligation, which action, conduct, error or omission was the proximate cause of injuries or damages to the Plaintiff; and/or were in some manner related to the previously named Defendants engaged in the activities alleged herein.  Plaintiff will seek leave to

5

amend this Complaint when the true names and capacities of the Doe Defendants
have been ascertained.

FACTUAL ALLEGATIONS

13.    Plaintiff is a 48-year-old married heterosexual man.

14.    He obtained his Masters in Political Science in 1993 and Ph.D.
in Political Science in 2005.

15.    Plaintiff was employed by the UH continuously from 1994 until
he was terminated on June 30, 2018.

16.    During his 24 years of employment at the UH, he served as the
Study Abroad Advisor from 1994 to 1997; the International Exchange Coordinator
in the Office of International Affairs from 1997 to 1999; in a variety of positions at
the Kapiolani Community College from 1999 to 2008; the Accreditation Coordinator
(Faculty Assistant Specialist) at the University Health Services Manoa ("UHSM")
from April 16, 2008, to January 31, 2014; and the Administrator of the UHSM Clinic
("Clinic") from January 2014 until June 30, 2018.

17.    At all relevant times herein, Dr. Nichols was the Director of the
Clinic and Plaintiff's supervisor.

18.    At all relevant times herein, Wendy Saelua ("Saelua") was the
Head Nurse at the Clinic and Plaintiff's coworker.

19.    Saelua had a long history of hostile and abusive behavior toward co-workers at the Clinic, including, but not limited to, intimidating, ridiculing, shaming, insulting, threatening, and bullying co-workers, allegedly accusing a para medical assistant of being gay around 2007, making co-workers afraid of her, yelling at nurses and doctors, accusing a nurse practitioner of stealing from the employer because she would come into work 5 to 10 minutes late, and other abusive and unprofessional conduct.

20.    The Clinic even had to move her office because she could not get along with the nurse practitioner.

21.    Even Dr. Nichols acknowledged that when Saelua gets mad at people she is unable to move beyond that.

22.    From April 16, 2008, to January 31, 2014, Plaintiff was the Accreditation Coordinator (Faculty Assistant Specialist) for the Clinic but his office was physically located a separate building across campus from the Clinic in the Queen Liliuokalani Student Services Center ("Center"). .

23.    During this time period, he would go to the Clinic to do work.

24.    Beginning in or around May of 2008 Saelua began hurling gay slurs at Plaintiff frequently and regularly when  he went to work at the Clinic.

7

25. Her gay slurs toward Plaintiff consisted of saying that she thought he had a husband, and not a wife, when he mentioned his wife; that her husband said the way he walked was gay; that she said he walked gay; that the way he talked sounded gay; that he "acted mahu (Hawaiian word for gay)"; and that the way he moved his hands was gay.

26. Saelua's gay slurs were abusive, demeaning, embarrassing, humiliating, insulting, offensive, harassing to Plaintiff, and he told her so many times. .

27. In February 2014, upon becoming the Administrator of the Clinic, Plaintiff had to move his office from the Center to the Clinic where Dr. Nichols and Saelua were working.

28. After he moved his office to the Clinic, Saelua increased the frequency of her gay slurs toward him when they were alone as well as when other coworkers were present, telling him that the way he talked sounded gay; that he "acted mahu"; that the way he moved his hands was gay, that the way he walked was gay; that the clothes he wore made him look gay; and that his politics were gay.

29. When Saelua began making gay slurs at Plaintiff in front of other people at the Clinic, Plaintiff reached a breaking point, believing that her insults

were intended to embarrass and humiliate him and undermine his authority as Administrator, and he asked her many times to stop making the gay slurs.

30.     Saelua ignored his request dismissively and continued hurling gay slurs at him.

31.     In early March 2015, Saelua told Plaintiff that she did not like the shirt he was wearing because it made him look gay, to which Plaintiff told her that his wife had given the shirt to him for Valentine's Day, but Saelua said she didn't care, it made him look gay.

32.     In early May 2015, Plaintiff wore the shirt again, and Saelua told him, "Didn't I tell you I don't like that shirt and not to wear it because it makes you look gay."

33.     Plaintiff never wore the shirt again to work.

34.     On or about June 5, 2015, Saelua pounded on his office door and yelled at him from outside of his office over an incident involving the relocation of the appointment desk.

35.     Between June 5, 2015, and June 26, 2015, Saelua became even more hostile toward Plaintiff by ignoring him, not talking to him, and/or making snide comments toward him in front of other co-workers.

36.    Dr. Nichols and Saelua at all relevant times herein had a close working relationship, and despite complaints of Saelua's repeated hostile behavior toward Plaintiff and other coworkers Dr. Nichols repeatedly refused to stop Saelua's hostile and harassing behavior.

37.    Dr. Nichols' inaction emboldened Saelua to continue to be hostile and offensive toward Plaintiff and others at the Clinic.

38.    Between June 5 and June 26, 2015, Plaintiff brought Saelua's hostile conduct to the attention of Laurie Otsubo-Chang ("Otsubo-Chang"), Office of Student Affairs ("OSA") Personnel Officer, to gain her assistance to get Saelua to stop the hostile treatment and gay slurs and to get Dr. Nichols, Director of the Clinic, to put an end to Saelua's hostile conduct.

39.    On or about June 5, 8, and 26, 2015, Plaintiff complained to Dr. Nichols about Saelua's gay slurs and abusive behavior and asked him to intervene and get Saelua to stop.

40.    Plaintiff told Otsubo-Chang that although he had already prepared a complaint to file with the UH, he told her that he was concerned that filing the complaint would anger Dr. Nichols and cause Dr. Nichols to retaliate against him.

10

41.     In an e-mail on June 16, 2015, Otsubo-Chang assured Plaintiff that he would not suffer any retaliation, stating, "Let's discuss the letter you wrote before giving it to him.  I must repeat, if a complaint comes forward no retaliation will be tolerated by any of the parties involved."

42.     On the morning of June 26, 2015, during an Executive Committee meeting, in the presence of Dr. Nichols and other co-workers, Saelua again acted in hostile manner toward Plaintiff by pushing her chair back from the table, huffing loud enough to be heard, and crossing her arms and glaring at Plaintiff with disdain.

43.     Dr. Nichols, who was sitting right next to Saelua, must have seen what Saelua was doing but ignored it and failed to do anything to stop her.

44.     After the meeting on the same day, seeing that Dr. Nichols had not counseled and/or reprimanded Saelua and/or impose some form of disciplinary measures to put an end to Saelua's abusive conduct, Plaintiff went to Dr. Nichols to lodge a written complaint against Saelua.

45.     Plaintiff told Dr. Nichols that Saelua's frequent and relentless hostility, including her gay slurs, toward him created an abusive andhostile work environment, and he was prepared to file a complaint against Saelua.

11

46.     In response, instead of being supportive, Dr. Nichols attempted to dissuade Plaintiff from filing a complaint against Saelu bytelling him that he "needs to have thick skin" and "needs to suck it up and deal with it" and warning him that filing such a complaint could become disruptive to the operations of the Clinic especially given Plaintiff's role as Administrator and Saelua's role as Head Nurse of the Clinic and that "investigations of such complaints rarely yield meaningful and positive outcomes to the persons involved and co-workers."

47.     Dr. Nichols' warnings left Plaintiff with a clear and distinct impression that Dr. Nichols was trying to protect Saelua and that filing the complaint would subject him to negative consequences and retaliation.

48.     On or about June 27, 2015, Plaintiff filed a written complaint against Saelua with Dr. Nichols as the Director of the Clinic and Otsubo-Chang as the Personal Officer of the UH Office of Student Affairs.

49.     His complaint alleged that Saelua had been subjecting him to gay slurs, discriminatory intimidation, ridicule, and insult at the Clinic, which undermined his authority and unreasonably interfered with his ability to function and perform his job as Administrator of the Clinic.

50.     Plaintiff's complaint was forwarded to Dr. Lori Ideta, the Interim Vice Chancellor of the University of Hawaii Manoa Office of Student Affairs.

12

51.     Within approximately two hours after Plaintiff filed the complaint against Saelua, Dr. Nichols engaged in discriminatory and retaliatory acts that was so severe or pervasive that it intensive the already abusive working environment, altered the conditions of Plaintiff's employment, and made it more difficult to do his job, including, but not limited to, the following:

a.      Dr. Nichols sent an e-mail to Plaintiff, Saelua, and Dr. Scholly suspending the weekly Monday G-4 meetings indefinitely, which meetings had never before been suspended.  The weekly G-4 meetings of the four main heads of the Clinic — the Director (Dr. Nichols), Administrator (Plaintiff), Head Nurse (Saelua), and Health Promotion Section Head (Dr. Scholly) — were critical to the administration and operations of the Clinic.  These meetings were indispensable to Plaintiff's ability to perform his duties and responsibilities as Administrator of the Clinic, to support the Director in UHSM leadership, program development, to direct and coordinate activities that promote the goals of UHSM, including clinical medicine, preventative health, fiscal, personnel management, information technology, accreditation, and health insurance related activities, and to manage and oversee Operations, Program Planning, Research and Evaluation, Facilities and Equipment, Liaison and other related matters.  The suspension of these meetings hampered, impaired, interfered, limited, and/or restricted Plaintiff's ability to

13

perform his duties and responsibilities.  On or about June 28, 2015, Plaintiff forwarded Dr. Nichols' email suspending the G-4 meetings to Personnel Officer Ostubo-Chang to inform her that Dr. Nichols was retaliating against him;

      b.     Dr. Nichols gave Plaintiff the silent treatment and stopped talking with him for a week between June 27, 2015, and August 4, 2015, except on five occasions on 6/29/15, 7/6/15, 7/14/15, 7/17/15, and 8/4/15, whereas in the past he spoke with Plaintiff every day, multiple times a day.  Dr. Nichols' sudden refusal to speak with Plaintiff hampered, impaired, interfered, limited, and/or restricted Plaintiff's ability to perform his day-to-day duties and responsibilities as Administrator;

      c.     Dr. Nichols instructed Plaintiff and Saelua to stop communicating directly with each other except when necessary and only through Dr. Nichols or via email copied to him, which made things worse because the limited form of communication made it more difficult for Plaintiff to do his job as Administrator;

      d.     On or about July 14, 2015, Dr. Nichols left an appointment letter of factfinders addressed to Dr. Nichols in the Clinic's copy machine in plain view.  Dr. Nichols' leaving the appointment letter in the copy machine in plain view where it could read by anyone was a serious breach of confidentiality as it contained

14

private and confidential information regarding the Plaintiff.  Plaintiff reported this breach to Otsubo-Chang and Shirley Hamakawa ("Hamakawa"), OSA Administrative Officer, which Hamakawa conveyed to Mike Kaptik ("Kaptik"), Interim Dean of Students.  When Dr. Nichols got wind of Plaintiff's complaint of his breach of confidentiality, Dr. Nichols called him into his office, immediately upon Plaintiff's return to the clinic, and told him that he was setting a new policy effectively immediately prohibiting the Clinic staff from telling anyone or reporting any issues that occur within the Clinic to entities outside of the Clinic.  Dr. Nichols' "new policy" was aimed at shutting Plaintiff up.  Plaintiff immediately returned to OSA and reported this to Otsubo-Chang and Hamakawa;

      e.    On or about August 4, 2015, due to the complaint filed by Plaintiff against Saelua, Dr. Nichols stopped all meetings with Plaintiff and started talking directly to Plaintiff's direct reports regarding matters that fell within Plaintiff's job description including clinical operational issues whereas prior to June 26, 2015, Plaintiff met with Dr. Nichols multiple times a week to discuss these matters;

      f.    Between August 4, 2015, to June 1, 2017, due to Plaintiff's complaint against Dr. Nichols, Dr. Nichols deliberately stopped talking to him one-on-one except on eight occasions on 8/4/15, 8/13/15, 8/18/15, 9/18/15, 6/15/16,

15

7/7/16, 8/16/2016, and 4/3/17 whereas prior to lodging the complaint, Dr. Nichols met with the Plaintiff multiple times a day from 2/2/2014 through 6/5/2015;

g.    On or about August 4, 2015, a patient filed a complaint about a doctor at UHSM and the complaint was forwarded Plaintiff to address. When Plaintiff investigated the patient's complaint, Dr. Nichols told him it was not his job to investigate it because it was a clinical matter. Dr. Nichols was wrong, as investigating a patient's complaint was one of Plaintiff's duties and responsibilities as Administrator, and he had investigated such complaints in the past; and

h.    Dr. Nichols and Saelua retaliated against Plaintiff again after an incident on or about August 13, 2015. A student had come to the Clinic for a blood draw but fainted at the chair. Plaintiff heard a thump outside of his office as if someone had fallen down and heard a lab student asking, "Are you okay?" Plaintiff ran outside of his office to check and called a Code Blue. Two nurses, Saelua and Sarah Edmundson, and one PMA, Lisa Solomon, responded and began administering medical care to the student. As Administrator of the Clinic, Plaintiff stood about 12 feet away in the hallway to make sure there was no disruption to the care being given to the student who had fainted. This had been in the role of Plaintiff in multiple drills. When the student regained consciousness, Plaintiff asked the nurses if he could bring water or juice for the student, because he heard the student

16

stating that he was fine and had not eaten anything. Saelua subsequently used this incident to falsely report to Dr. Nichols that Plaintiff had interfered with patient care during the Code Blue. Without speaking with Plaintiff first to understand the circumstances, Dr. Nichols in turn used this opportunity to attack Plaintiff by writing a formal letter, on an official Clinic letterhead, falsely accusing him of interfering with patient care by his "continued immediate physical proximity to the patient." Had he spoken with him, he would have learned that Plaintiff was standing 12 feet away from where the nurses were providing medical care to the student and that he did not and could not have interfered with patient care. Dr. Nichols' letter was highly irregular and unusual because 98 out of 99 incident reports never resulted in a written summary like the one Dr. Nichols issued against Plaintiff. Dr. Nichols' letter presumably was placed in Plaintiff's personnel file, given the nature of the letter. Dr. Nichols' issuance of the letter and presumably placing it in Plaintiff's personnel file constituted an adverse employment action.

52. On or about July 14, 2015, Plaintiff met Hamakawa , Otsuob-Chang, and Kaptik, to discuss the Dr. Nichols' hostility and retaliation.

53. On or about July 17, 2015, Plaintiff met with Kaptik, Otsubo-Chang, and Dr. Nichols to discuss ways to deal with Dr. Nichols' hostility and retaliation against Plaintiff.

17

54.     During this meeting, Dr. Nichols accused Plaintiff of being overly sensitive and continued to act in a defensive and unprofessional manner and towards the end of the meeting Dr. Nichols turned extremely red, started shaking uncontrollably and put his head in his hands and arms on his knees.

55.     On or about September 18, 2015, Plaintiff met with Dr. Nichols to discuss retaliation by Saelua, and Dr. Nichols told him, "Well, does that surprise you, an investigation was launched against her, it doesn't surprise me honestly, I'm not saying because the two of you . . . when someone attacks someone I think that that is not unusual as an outcome, that people are not all chummy."

56.     Later in the meeting Dr. Nichols stated that Plaintiff's complaint does not "warrant an investigation, I think this is, I'm guessing that if I ask about this, I have a feeling, I will get a completely get a different story. We had a similar conversation back in June that obviously pissed you off and provoked you to take it a step further…you took it to vice chancellor."

57.     Dr. Nichols' comments suggest that Plaintiff's filing of the complaint against Saelua and disregard of Dr. Nichols' warnings upset Dr. Nichols and caused him to retaliate against Plaintiff.

58.     On or about September 25, 2015, Plaintiff applied for Contract Renewal, as he was required to apply for Contract Renewal pursuant to the

18

Collective Bargaining Agreement guidelines because he was in his second year of his contract.

59.    Dr. Nichols and Kaptik both recused themselves from evaluating Plaintiff's dossier due to an active investigation of Plaintiff's complaint against Dr. Nichols.

60.    In contrast, Dr. Nichols refused to recuse himself from assessing Plaintiff for his Application for Tenure and Promotion in or about December 2016.

61.    In December 2015 Plaintiff was granted contract renewal commencing on or about July 1, 2016.

62.    Being granted a contract renewal demonstrates successful progress toward tenure, that the Faculty Member's performance has been assessed for strengths and weaknesses and has been rated as satisfactory, that there is a continuing need for the Faculty Member's services at the University, and that the Faculty Member has made the professional improvement or has demonstrated the professional and personal qualities needed by the Department, or similar circumstances, all of which means that more than likely Plaintiff was on track to getting tenure.

19

63.     Prior to being awarded the contract renewal on September 25, 2015, Plaintiff did not receive any negative assessments from Dr. Nichols or anyone else.

64.     In fact, in 2012 Plaintiff was promoted from the rank of S-3 (Assistant Specialist) to the rank of S-4 (Associate Specialist) and in 2014 he was promoted from S-4 (Associate Specialist) as Accreditation Specialist, Non-Tenure Track to S-4 (Associate Specialist) as Administrator Tenure Track.

65.     On or about October 19, 2015, Plaintiff sent an email to Dr. Nichols complaining about his continuing hostility and retaliation and asking him to cease and desist his behavior toward Plaintiff.

66.     Plaintiff copied this email to Dr. Ideta, Kaptik, Otsubo-Chang, and Hamakawa and blind copied to Joan Fukumoto ("Fukumoto") of UH Manoa HR.

67.     Plaintiff had held off on filing a formal complaint against Dr. Nichols but he reached a point where it became obvious that the UH administrators were not doing anything to mitigate the hostile work environment and retaliation.

68.     When Fukumoto told Plaintiff that his cease and desist email put UHM on notice and he would need to file a formal complaint against Dr. Nichols

20

for retaliation, Plaintiff decided to proceed and draft the complaint against Dr. Nichols.

69.     On or about November 5, 2015, Plaintiff filed a complaint against Dr. Nichols for retaliation and hostile work environment, in accordance with the University of Hawai`i Executive Policy EP 9.210 Workplace Non-Violence.

70.     After Plaintiff lodged his verbal complaint and written complaint against Saelua and Dr. Nichols, Dr. Nichols and/or other UH employees engaged in further discriminatory and retaliatory acts that was so severe or pervasive that it altered the conditions of Plaintiff's employment and created an abusive work environment, including, but not limited to, the following:

a.     On or about October 16, 2015, Dr. Ideta issued a decision regarding Plaintiff's complaint against Saelua, which Plaintiff received on October 23, 2015, finding that "the evidence does not support a cause determination of a violation of the *University of Hawai`i Executive Policy EP 9.210 Workplace Non-Violence.*" Dr. Ideta's decision was biased and contradicted by the fact that the investigation validated and/or substantiated many of Plaintiff's allegations. In her decision, Dr. Ideta criticized Dr. Nichols' leadership at the Clinic, stating that "several interviewees commented on the current leadership style of the department and that there should be more transparency and inclusiveness with faculty and staff.

21

The investigation revealed that when issues arise within the department, they must be addressed appropriately and in a timely manner." On or about October 22, 2015, following Dr. Ideta's criticism of Dr. Nichols' leadership, Dr. Nichols retaliated against Plaintiff by rejecting a $592,000.00 Title X grant, knowing that acceptance of the grant would have almost guaranteed Plaintiff's tenure and promotion, which he knew Plaintiff was going to apply for within the year;

b.     Dr. Nichols continued to retaliate against Plaintiff by steering away the weekly meetings he had been having with Plaintiff prior to June 2015 regarding billing and front desk operations from Plaintiff to Sheri Ching ("Ching"), Business Office Manager, and meeting with her twice a month instead of Plaintiff. The re-instatement of these meetings with Ching and not discussing Business Office issues with Plaintiff was an adverse employment action against Plaintiff because it altered the conditions of Plaintiff's employment and hampered, impaired, interfered, limited, and/or restricted Plaintiff's performance of his duties and responsibilities as Administrator. Plaintiff notified Hamakawa of Dr. Nichols' retaliatory actions in re-instating meetings with Ching and not discussing matters with him;

c.     On October 7, 2016, Plaintiff submitted an Application for Tenure at the S-4 Rank and Promotion to the S-5 Rank. After Plaintiff filed the

complaint, Dr. Nichols became extremely upset at Plaintiff and increased his retaliation by continuing to not give him assignments; taking assignments from him; rarely talking to him; instructing staff members to come to him instead Plaintiff regarding areas that were clearly under his purview; increasing surveillance of Plaintiff; and ostracizing and shunning Plaintiff;

        d.     UH refused to get Dr. Nichols and Kaptik to recuse themselves from reviewing or responding to Plaintiff's Application for Tenure and Promotion. On April 21, 2016, Plaintiff sent an email to Dr. Beverly McCreary ("Dr. McCreary"), Assistant Vice Chancellor for Academic Personnel, asking her to confirm that Dr. Nichols and Kaptik would be recused from reviewing Plaintiff's Application for Tenure and Promotion, as they had earlier recused themselves from Plaintiff's contract renewal process. On April 26, 2016, Dr. McCreary sent a reply email to Plaintiff stating that she would look into it. On or about July 11, 2016, Plaintiff sent another email to Dr. McCreary asking her again that Dr. Nichols and Kaptik would be recused from reviewing his tenure and promotion dossier. On or about July 18, 2016, Dr. McCreary sent a reply email denying Plaintiff's request for Dr. Nichols and Kaptik to be recused;

        e.     Dr. Nichols refused to recuse himself from taking part in Plaintiff's Tenure and Promotion review and subsequently submitted a false and

misleading negative assessment of Plaintiff for his Tenure and Promotion, which led to the denial of Plaintiff's Application for Tenure and Promotion on June 28, 2017, which in turn led to the issuance of a Terminal Year Contract terminating his employment at the UH on June 30, 2018. This negative assessment constituted an adverse employment action against Plaintiff because it hampered, impaired, interfered, limited, and/or restricted Plaintiff's ability to receive a fair and objective assessment;

    f.  On or about August 22, 2016, Kaptik issued directives to Plaintiff which limited his movement within the Clinic, which in turn hindered his ability to perform his duties and responsibilities as Administrator. These directives hampered, impaired, interfered, limited, and/or restricted Plaintiff's ability to discharge his duties and responsibilities;

    g.  On or about August 25, 2016, Plaintiff sent an e-mail to Dr. Nichols requesting that in the future he be given information to enable Plaintiff to perform his job. Dr. Nichols' non-communication with Plaintiff and not giving him information needed altered the conditions of Plaintiff's employment and hampered, impaired, interfered, limited, and/or restricted Plaintiff's work performance as Administrator of the Clinic;

h.      On or about August 25, 2016, Plaintiff received an e-mail from Dr. Nichols directing him to seek permission to attend University committee meetings.  Dr. Nichols had never before imposed any such restriction or limitation on Plaintiff.  Dr. Nichols' demand that Plaintiff obtain permission to attend University Committee meetings altered the conditions of Plaintiff's employment and hampered, impaired, interfered, limited, and/or restricted Plaintiff's work performance as Administrator of the Clinic and the duties of University Service that is required of Faculty;

i.      On or about September 8, 2016, Plaintiff received an e-mail from Ms. Mie Watanabe ("Watanabe"), Director of UH-System EEO/AA Office, informing him that Saelua filed a complaint against him and wanted to pursue an informal resolution.  Nothing came of this as Plaintiff requested a formal investigation into Saelua's false claims.  For three weeks there were several e-mails between the Plaintiff and Watanabe. There was never a formal investigation pursued and this just appeared to be further retaliation by Saelua;

j.      The UH interfered, altered, limited, and/or restricted Plaintiff's appeal of the denial of his Application for Tenure and Promotion.  On or about April 24, 2017, Plaintiff was informed that the TPRC denied the appeal and he was not being recommended for tenure and promotion. Dr. Lassner, serving as

25

Interim Chancellor, stated that "your application has been carefully reviewed at all levels…" Had the Plaintiff's application been carefully reviewed, even at the Interim Chancellor level, Dr. Lassner knew or should have known that the reviews posited lies and did not provide a fair, unbiased, and objective assessment of the Plaintiff's record. Dr. Lassner's lack of close review altered the conditions of Plaintiff's employment and prevented Plaintiff from receiving a fair and objective review of his dossier and tenure and promotion;

    k. On or about May 3, 2017, the Plaintiff was able to review the final TPRC's appeal assessment which revealed a fundamental misunderstanding of the guidelines and process and stated lies in its decision of the appeal. The TPRC also revealed a bias when they stated, "the fact of simultaneously asking for promotion was noted critically and may have biased the TPRC#9 members." This is one of many comments that shows the fundamental misunderstanding of the requirements of Faculty Specialist at rank 4. The TPRC also did not apply the OSA criteria guidelines to the Plaintiff's dossier. The Chancellor and or President can overturn the decision of the DPC, Director, Dean, and TPRC. The Chancellor and President did not exercise their independent judgement and if they had they would have clearly seen the bias, lies, and non-application of guidelines. This was a willful act. Dr. Lassner's and Dr. Straney's bias constituted an adverse employment action

26

against Plaintiff because it hampered, impaired, and interfered with Plaintiff receiving a fair and objective review of his dossier;

l.    On or about May 5, 2017, Plaintiff sent Dr. Nichols an e-mail requesting that he be allowed to do his job as Dr. Nichols has not talked to him since 2015 and sought information from staff that reported to the Plaintiff. The e-mail specifically stated "Due to the lack of communication that has existed since November 2015, I would like to ask that if you have questions regarding any aspect of fiscal matters or day-to-day operations, including new issues that are not fully formulated and currently in the discussion phase with other departments, please contact me and not other members of the staff that may not know all the nuances as they are only peripherally involved." Dr. Nichols did not change and continued to not interact with the Plaintiff.  Dr. Nichols' non-communication with the plaintiff constituted an adverse employment action against Plaintiff because it hampered, impaired, interfered, limited, and/or restricted Plaintiff's ability to discharge his duties and responsibilities;

m.    On or about September 6, 2017, Plaintiff received an e-mail form Dr. Nichols informing him that the new hire in position number 0079646 would no longer report to the Plaintiff but instead report to Dr. Nichols.  On or about September 8, 2017, Plaintiff e-mailed Dr. Ideta informing her that Dr. Nichols had

27

taken away Plaintiff's supervisory capacity over position number 0079646.  Dr. Ideta replied to the Plaintiff via USPS letter dated September 18, 2017 and stated that "this decision appears to be based on operational need and is within the Director's authority. There is no adverse action to you."  This position since its creation in 2012 had always reported to the Administrator;

        n.     On or about March 3, 2018, Plaintiff received an e-mail from Otsubo-Chang that stated an assignment he had been doing since the creation of HMSA's PPM program in January 2017, was taken away from him and given to the new hire in position number 0079646.  On or about April 6, 2018, Plaintiff received a text message from the IT Specialist, Ms. Kinder, asking for an alarm code for a person he had never heard of. Ms. Kinder informed him that it was a new hire to fill the vacant secretary position which had been converted to an Administrative, Professional and Technical position.  On or about April 6, 2018, Plaintiff sent Dr. Ideta an e-mail informing her of this new position re-description and hire and that was retaliatory as it took away supervisory and job duties from the Plaintiff. On or about April 9, 2018, Dr. Ideta replied to Plaintiff and stated, "The position of Institutional Support/ Admin & Fiscal Support Specialist reports directly to the Director of the UHSM and therefore, action taken to fill this position is not retaliatory against you." However, the Plaintiff's job description specifically states

28

"the Administrator is responsible for the management of day-to-day UHSM operations, including personnel hiring, supervision and evaluation ...." Thus, not being informed of the position's re-description from a secretary to APT and hiring is taking away job assignments from the Plaintiff and not allowing him to do his job; and

 o. On or about April 16, 2018, Plaintiff received an e-mail with Executive Committee Meeting notes. Plaintiff noticed that there was a discussion about AAAHC Accreditation. After contacting colleagues that were at the Executive Committee meeting the Plaintiff discovered that Dr. Nichols tasked Saelua to investigate changes to Accreditation Standards. Plaintiff's job description specifically stated, "coordinate and supervise accreditation efforts." This is retaliatory in not assigning tasks that fall under the purview of his job description and constituted adverse employment action as it hampered, impaired, interfered, limited, and/or restricted Plaintiff's ability to discharge his duties and responsibilities.

 71. Dr. Nichols continued these acts of discriminatory intimidation and retaliation until Plaintiff's employment termination by the UH on June 30, 2018.

 72. Dr. Nichols' and Saelua's discriminatory and retaliatory actions against Plaintiff permeated throughout the workplace were sufficiently severe or

pervasive to alter the conditions of Plaintiff's employment and created an abusive working environment.

73.    Dr. Nichols's and Saelua's hostile conduct polluted Plaintiff's workplace, making it more difficult for him to do his job, to take pride in his work, and to desire to stay in his position.

74.    The severity and pervasiveness of the abusive working environment created by Dr. Nichols and Saelua is confirmed by the following witnesses who worked with Plaintiff at the Clinic and experienced it first-hand:

a.    On August 21, 2017, Ching sent an email to Plaintiff stating, "I can't believe that UH would allow this type of hostile and retaliatory work environment to continue these past couple years. Everything was fine from when you began with the clinic as an Accreditation Specialist to the first year as our Administrator. The weekly Monday meetings with Dr. Nichols, Wendy, Kristen, and yourself, always seemed like a cohesive group that worked extremely well together. Who knew that bringing up a minor complaint, would blow up to something this big. I still don't get how a Director does not communicate with the Administrator, especially since you are responsible for all fiscal and personnel matters. How does the Director include the Head Nurse on fiscal matters, but you are not included in meetings or even let alone informed that there is a meeting? That still baffles me!

30

One of the reasons why I never said or reported anything was seeing all the harsh treatment that you've had to endure. I guess I'm not as strong as you. You know I really thought I would retire from the clinic, but with all the ongoing hostility and silos within the clinic it made it such a difficult place to work. I needed to get out for my own sanity";

      b.     On August 22, 2017, Bryson Ho ("Ho"), Fiscal Specialist for UHSM, stated : "Sorry to hear that your (sic) going through a lot of issues at the office since you filed your complaint in 2015. In you (sic) absence it has been extremely difficult to keep the business office operating at its fully capacity. The business office has been severely understaffed (including student workers) and those employees that we have managed to retain are constantly overworked taking over the burden from those who have left (Including vacations and sick leave). Although it would have been nice to have you back in the office, I completely understand the need to work from home as the treatment by Dr. Nichols and Wendy continue to degrade the clinic and its functions. It is disheartening to know that Dr. Nichols and Wendy continue to treat you as well as other clinic staff in a hostile and retaliatory manner. Unfortunately in my opinion, I do not think this retaliatory behavior by Dr. Nichols or Wendy will change. As evidence, the "Customer Service Training" sessions that have occurred since your departure has shown no improvement at all

with the communication in the clinic by Dr. Nichols and Wendy (Both between units as well as with management). I cannot understand how Dr. Nichols and Wendy can continue to treat their colleagues in such a hostile manner and without the University of Hawaii at Manoa stepping in to address the clear and precise issues at University Health Services at Manoa"; and

   c.  On August 23, 2017, Sharon Hiu, D.O. ("Hiu"), UHSM Staff Physician, who worked at the Clinic, wrote, "Since 2014, as Administrator, Dr. Campos has done much to improve the business aspect, physical space, and functionality of the clinic.  He was able to work effectively and collaboratively with the Medical Director, Head Nurse and other staff members.  However, since he filed a complaint, I have seen his role diminish and his movement within the clinic limited.  His ideas and contributions are minimally acknowledged during Executive Committee meetings and many of his duties are delegated to other staff members. Communication with our Medical Director [Dr. Nichols], Head Nurse [Saelua] and some staff members are strained or non-existent. It has been difficult to witness the hostility and animosity that Dr. Campos has had to endure from those he should be working most with. Yet, he was able to work with all units to conduct training and maintain professionalism during and after a recent accreditation site visit despite the lack of support and his dedication, hard work and effort was barely acknowledged.

32

I am amazed at how much Dr. Campos has been able to accomplish given the hostility and negative environment he has had to endure and the strain on his mental health. Seeing first-hand how Dr. Campos has been treated, his role and duties trivialized, and the isolation he has endured since filing his complaint has created a difficult environment within the clinic with many now keeping silent for fear of retaliation. Several staff members have chosen to leave or have decided to retire and others are contemplating leaving due to this caustic environment. I sincerely hope for a fair and equitable outcome in this matter."

75.     Once the UH was apprised of Dr. Nichols' and Saelua's behavior, the UH refused to take prompt and effective remedial action, including, but not limited to, some form of disciplinary measures, which must be proportionate to the seriousness of the offense, which requires more than a mere request to refrain from discriminatory conduct.

76.     UH undertook no remedy and/or the remedy did not end the current harassment and deter future harassment.

77.     The UH failed, neglected, and/or refused to allow Plaintiff to be transferred out the Clinic to the Political Science Department, as shown below:

a.     On or about April 11, 2016, Plaintiff met with Dean Donald Young, Ph.D. (Decision Maker) ("Dr. Young") and Ms. Trisha Kimura, J.D.

33

(representative from the UH-Manoa Office of Academic Affairs) ("Kimura") to discuss the decision on Plaintiff's retaliation complaint against Dr. Nichols. During the discussion, Dr. Young and Kimura stated that Plaintiff was much more of an academic and they felt he should be in a more academic position. They asked him where he would want to move to, and he said either the Honors Department, Political Science Department, or the Peace Institute. However, in June 2016, UH told Plaintiff that transferring his position was "not doable." However, in August 2016, and confirmed on or about October 25, 2016, Plaintiff discovered that Denise Konan, Ph.D., Dean of Social Sciences, never contacted the Political Science Department and thus never had any intention of transferring Plaintiff out of the hostile work environment at the Clinic; and UH refused to allow Plaintiff to be transferred out of the Clinic to the Political Science Department; and

        b.      On or about May 27, 2016, Plaintiff wrote an e-mail to Kapitik, copied to Ideta, Otsubo-Chang and UHM HR that requested an accommodation and stated, "Given the continued hostility that I am exposed to by Ms. Wendy Saelua, I would like to ask for accommodation to move my office to the Health Promotion Office at QLC third floor. If granted I will be at my office at UHSM about three hours a day, 7am to 8am, 11:30am to 12:30pm, and 3pm to 4pm. All other times I will be in Health Promotion Office. I am asking this for my safety

and sanity as I have been dealing with a psychiatrist for the last 11 months regarding the hostility directed at me from Saelua and Dr. Nichols." Kaptik did not reply until June 3, 2016 and a meeting was scheduled on June 7, 2016. On or about June 7, 2016, Plaintiff met with Kaptik regarding an accommodation, no accommodation was given as Kaptik said there was no space in the Queen Liliuokalani Student Services Center. Nothing was done to provide an accommodation until a further discussion on July 7, 2016.

78.    On or about July 7, 2016, Plaintiff met with Kaptik, Dr. Nichols, and Otsubo-Chang to discuss an accommodation as nothing improved at the Clinic. It was decided that Plaintiff would work from behind closed doors or from home if needed. Dr. Nichols expressed his discomfort with the accommodation.

79.    On or about August 16, 2016, Plaintiff forwarded to Kapitik and Dr. Ideta the email Plaintiff sent to Dr. Nichols on August 11, 2016 in which he notified Dr. Nichols about Saelua's unprofessional behavior and stated "On multiple occasions I have informed you of the continued hostile environment perpetuated by Saelua and find the University's inability to rectify this situation to be absolutely negligent, especially in light of the recent Title IX training that all staff was required to complete. Thus, I am informing you again of the continued hostility and ask: What is being done to ensure a positive and professional environment exists in the clinic

35

and what is being done to ensure that Saelua starts treating people in a professional manner?"

80.    Neither Dr. Ideta nor Kaptik responded to Plaintiff's email.

81.    On October 7, 2016, Plaintiff submitted an Application for Tenure at the S-4 Rank and Promotion to the S-5 Rank.

82.    On or about November 15, 2016 through January 24, 2017, Plaintiff had to take a mental health leave due to the constant stress and retaliation he had to endure.

83.    Plaintiff's physician stated in a doctor's note, "Due to acute stressors stemming from a work related situation, I do not believe it is healthy for Dr Campos to return to work at the clinic at this time"

84.    On or about September 5, 2017, Plaintiff's medical condition was determined to be a workplace injury.

85.    While Plaintiff was on sick leave between November 15, 2016 and January 24, 2017, Employer conducted its DPC and DC review of Plaintiff's Tenure and Promotion Review Application. Both the DPC Chair and Director knew of this sick leave and produced lies in their assessment.

86.    On or about February 17, 2017, Plaintiff was notified that he was not being recommended for tenure or promotion.

87.     The Departmental, Director, Dean, and University Tenure and Promotion Review Committee (TPRC) assessments contained numerous inconsistencies and misrepresentations made by the DPC Chair and the Director (Dr. Nichols), both of whom were biased and prejudiced against Plaintiff, which prevented Plaintiff from receiving a fair and objective review of his dossier.

88.     On or about April 2, 2017, Ching e-mailed Dr. Ideta informing her that she was resigning from the Clinic because she felt retaliated against and that "I [Sheri Ching] chose not to mention anything after seeing the negative treatment Joseph Campos received after he voiced his concerns. In my opinion, I believe the problems at UHSM was already there long before Joseph Campos became the administrator, just no one chose to say anything."

89.     On or about April 12, 2017, Plaintiff met with Dr. Ideta to discuss the negative decision for Tenure and Promotion and the continued hostility at the office.

90.     On or about April 20, 2017, Plaintiff filed retaliation complaints against Dr. Nichols and Saelua with Dr. Ideta in accordance with *University of Hawai`i Executive Policy EP 9.210 Workplace Non-Violence.*

37

91.     The complaint against Dr. Nichols was for retaliation after Plaintiff filed a retaliation complaint on November 5, 2015 (for filing a complaint against Saèlua).

92.     The complaint against Saelua was for retaliation against Plaintiff after he filed a complaint of hostile work environment and discriminatory comments on June 27, 2015.

93.     On or about April 24, 2017, Plaintiff was informed that the TPRC denied the appeal and he was not being recommended for tenure and promotion.

94.     Dr. Lassner, serving as Interim Chancellor, stated that "your application has been carefully reviewed at all levels…"

95.     The reviews contained lies and did not provide a fair and unbiased assessment of the Plaintiff's record.

96.     On or about May 3, 2017, Plaintiff was able to review the final TPRC's appeal assessment which revealed a fundamental misunderstanding of the guidelines and process and stated lies in its decision of the appeal. The TPRC also revealed a bias when they stated, "the fact of simultaneously asking for promotion was noted critically and may have biased the TPRC#9 members."

97.     This is one of many comments that shows the fundamental misunderstanding of the requirements of Faculty Specialist at Rank 4.

38

98.    The TPRC also did not apply the OSA criteria guidelines to the Plaintiff's dossier. The Chancellor and or President can overturn the decision of the DPC, Director, Dean, and TPRC. The Chancellor and President did not exercise their independent judgement and if they had, they would have clearly seen the bias, lies, and non-application of guidelines.

99.    Dr. Nichols did not change and continued to not interact with the Plaintiff.

100.    On or about July 6, 2017, Plaintiff received letters from Dr. Ideta that said she was not investigating the April 20, 2017, complaints on the erroneous claim that the allegations were previously addressed in complaints previously investigated.

101.    The rationale posited by Dr. Ideta had no basis in fact as the evidence presented on May 26, 2017, involved incidents that occurred <u>after</u> the investigations in 2015.

102.    This was another attempt by UHM to silence the Plaintiff's opposition to the hostile work environment and retaliation he endured and a willful act to cover up the hostile work environment and silence Plaintiff's opposition.

103.   On or about September 6, 2017, Plaintiff received an e-mail form Dr. Nichols informing him that the new hire in position number 0079646 would no longer report to the Plaintiff but instead report to Dr. Nichols.

104.   On or about September 8, 2017, Plaintiff e-mailed Dr. Ideta informing her that Dr. Nichols had taken away Plaintiff's supervisory capacity over position number 0079646.

105.   Dr. Ideta replied to the Plaintiff via USPS letter dated September 18, 2017 and stated that "this decision appears to be based on operational need and is within the Director's authority.

106.   On the contrary, this position since its creation in 2012 had always reported to the Administrator.

107.   On or about November 2, 2017, Plaintiff attended the negative tenure appeal hearing. Dr. McCreary presented false statements of fact and presented information from selective investigations rather than investigating the entire DPC to the hearing officer, Tranh Truc T. Ngyuen ("Dr. Ngyuen").

108.   Dr. Nguyen, was biased based on highly inappropriate comments made during the hearing. Specifics comments, which were inappropriate, problematic, and biased, were the following: (1) she said she was concerned about Plaintiff's health and what this experience was doing to him towards the end of the

hearing; and (2) when Plaintiff told her that the Director had not spoken to him in two and half years she replied that "you are not fulfilling the responsibilities of your job by not supporting the Director."

109.    Between April 2018 and June 2018, Employer, by and through its administrators, including by not limited to, Dr. Straney and Dr. Lassner interfered, restricted, and limited Plaintiff's right to file a grievance and to receive a fair hearing, pursuant to *University of Hawai`i Executive Policy EP 9.210 Workplace Non-Violence*.

110.    On or about June 30, 2018, Plaintiff was terminated from his position as Administrator of the UHSM, in retaliation against Plaintiff for filing complaints against Dr. Nichols and Saelua.

111.    The Employer sabotaged, frustrated and impaired Plaintiff's ability to pursue his grievance of UHM's  actions in retaliation against Plaintiff for filing complaints against Dr. Nichols and Saelua, by doing the following:

        a.    Dr. Lassner wrongfully upheld Dr. Straney's redactions of 84.21% of the allegations in Plaintiff's April 30, 2018 grievance/complaint, which redactions were unauthorized and unlawful; ignored Plaintiff's grievance/complaint, which was unlawful; and wrongfully upheld TPRC's recommendation for non-tenure of Plaintiff's Tenure and Promotion Application;

41

b.    Dr. Straney knowingly conducted a sham investigation on July 31, 2018, a month after Plaintiff was terminated from his employment, which investigation dragged on and is still ongoing as of June 27, 2019; deliberately and unilaterally redacting 84.21% of the allegations in Plaintiff's April 30, 2018 grievance/complaint without Plaintiff's consent and/or knowledge; deliberately and falsely declaring that Plaintiff's grievance/complaint was time-barred under the collectively bargaining agreement, to discourage and silence Plaintiff from pursuing his grievance/complaint; and deliberately and wrongfully upholding the hearing officer's decision denying Plaintiff's appeal of the UH's denial of Plaintiff's Tenure and Promotion Application, as part of Employer's continuing scheme to discourage and silence Plaintiff;

c.    Dr. Ideta deliberately ignored Plaintiff's complaints about Dr. Nichols's retaliatory acts; deliberately and falsely declared that Plaintiff's current evidence of retaliation was addressed in previous investigations to discourage and silence Plaintiff from pursuing his grievance/complaint; deliberately silenced Plaintiff's opposition to Dr. Nichols' and Saelua's retaliatory acts; deliberately refused to investigate Plaintiff's April 20, 2017, complaint against Dr. Nichols for retaliation for filing of a retaliation complaint against Dr. Nichols; and deliberately refused to investigate Plaintiff's April 20, 2017 complaint against

Saelua for retaliating against him for filing a complaint against her for sex discrimination and hostile work environment;

   d. Dr. Nichols wrote a false and misleading negative Department Assessment against Plaintiff in which Dr. Nichols recommended to the Dean of Student Services, the TPRC, the UH Interim Chancellor David Lassner to deny Plaintiff's application for tenure and promotion; creating a hostile work environment in which Plaintiff was unable to fulfill his job description due to Dr. Nichols' refusal to communicate with Plaintiff, hindering his ability to perform his duties; took away job assignments which were part of Plaintiff's job description by giving it to someone else or circumventing the Plaintiff; refused to give new job assignments to Plaintiff; took away Plaintiff's supervisory capacity resulting in Plaintiff supervising fewer and fewer employees, which prior to engaging in the protected activity, Plaintiff had direct supervision of three employees and indirect supervision of approximately five full-time employees and six part-time student employees; monitoring Plaintiff's movement and daily whereabouts whereas prior to the filing the complaints Dr. Nichols did not monitor Plaintiff at all; threatened and/or intimidated Plaintiff at his workplace;

   e. Dr. Nichols engaged in willful acts against Plaintiff by making false and misleading statements of fact in his Department Assessment of

Plaintiff's Tenure and Promotion Application, dated December 1, 2016; falsely stating that Plaintiff had never done audits; falsely stating that Plaintiff had been unreliable in supporting the Director's leadership and had actually hindered the Director's ability to lead and contribute innovating enhancements; and falsely stating that Plaintiff's supervisory employee staffing decision making exhibited poor judgment at times; and

f.    Dr. Scholly engaged in willful acts in the following manner. She wrote lies in the DPC Tenure and Promotion Application review letter. During the review process around December 2016, Dr. Scholly called Mandy R. Westfall-Senda, an Assistant Specialist Rank III member of OSA (Office of Student Affairs), who voted in favor of Plaintiff's tenure, asked why she voted in Plaintiff's favor and told her they wanted her to change her vote because the DPC wanted a unanimous negative vote against Plaintiff.

112.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff was taken off worker's compensation and made to work from his home, which altered the conditions of his employment and make it difficult to perform his job as Administrator of the Clinic.

44

<u>COUNT I</u>
*HOSTILE WORK ENVIRONMENT PURSUANT TO TITLE VII CIVIL RIGHTS ACT OF 1964 AND HAWAII REVISED STATUTES §§ 378-1 AND 378-2*

113.  Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

114.  Defendants at all relevant times herein unlawfully harassed Plaintiff and/or created and maintained a hostile work environment, resulting in adverse employment actions being taken against Plaintiff, in violation of Title Vii Civil Rights Act of 1964 and Hawaii Revised Statutes §§ 378-1 and 378-2.

115.  Plaintiff was subjected to verbal conduct of a sexual nature, and the conduct was unwelcome.

116.  Plaintiff was also subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and created an abusive work environment.

117.  Defendants' hostile and/or abusive conduct made Plaintiff's workplace toxic and made it more difficult for him to do his job, take pride in his work, and to desire to stay in his position.

118.  Defendants' wrongful conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and created an abusive work environment.

45

119.   Defendants were apprised of Saelua's and Dr. Nichols' wrongful conduct against Plaintiff.

120.   Defendants knew, had reason to know, or should have known, about Saelua's and Dr. Nichols' abusive conduct.

121.   Defendants failed, neglected, and/or refused to correct or prevent the discriminatory and/or retaliatory conduct by Saelua and Dr. Nichols, and to take prompt, effective, and adequate remedial and disciplinary action.

122.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to recover back pay, front pay, compensatory damages, special damages, and general damages, including reasonable attorneys' fees and costs of suit, in such amounts as shall be shown at a trial or hearing hereof.

<u>COUNT II</u>
*RETALIATION PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND HAWAII REVISED STATUTES §§ 378-1 AND 378-2*

123.   Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

124.   Plaintiff is, and was at all relevant times herein, a member of the protected class pursuant to Title VII of the Civil Rights Act of 1964 and Hawaii Revised Statutes §§ 378-1 and 378-2.

125. Defendants at all relevant times herein unlawfully harassed Plaintiff and/or created and maintained a hostile work environment due to his protected activity, resulting in adverse employment actions being taken against Plaintiff, in violation of Title VII and Hawaii Revised Statutes §§ 378-1 and 378-2.

126. Plaintiff was subjected to retaliation and, ultimately, termination of employment for engaging in protected activity.

127. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to recover back pay, front pay, compensatory damages, special damages, and general damages, including reasonable attorneys' fees and costs of suit, in such amounts as shall be shown at a trial or hearing hereof.

COUNT III
*WRONGFUL TERMINATION AND RETALIATION PURSUANT TO THE WHISTLEBLOWER'S PROTECTION ACT, HRS § 378-62*

128. Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

129. Plaintiff reported or was about to report to the Employer a violation, or a suspected violation, of law, rule, ordinance, or regulation, adopted pursuant to law of the State of Hawaii, a political subdivision of the State of Hawaii, or the United States.

130.   Due to Plaintiff's Protected Activity, Employer retaliated and/or otherwise discriminated against Plaintiff regarding his compensation, terms, conditions, or privileges of employment.

131.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to recover back pay, front pay, compensatory damages, special damages, and general damages, including reasonable attorneys' fees and costs of suit, in such amounts as shall be shown at a trial or hearing hereof.

COUNT IV
*WRONGFUL RETALIATORY DISCHARGE*

132.  Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

133.  Employer wrongfully denied Plaintiff's application for tenure and promotion and terminated or effectively terminated his employment.

134.  Plaintiff was terminated for engaging in protected activity.

135.  Defendants' wrongful conduct caused Plaintiff suffered injury and/or a damages.

136.  As a direct and proximate result of Employer's wrongful conduct, Plaintiff is entitled to recover compensatory, pecuniary, special, and general damages in such amounts as shall be shown at a trial or hearing hereof.

48

## COUNT V
### *WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY*

137. Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

138. Employer terminated Plaintiff's employment in retaliation for blowing the whistle on Dr. Nichols' and/or Saelua's wrongful conduct.

139. Employer's discharge of Plaintiff's employment was unlawful in violation of public policy, pursuant to *Parnar*.

140. As a direct and proximate result of Employer's wrongful conduct, Plaintiff is entitled to recover compensatory, pecuniary, special, and general damages in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VI
### *INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS*

141. Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

142. Defendants' wrongful conduct constitutes intentional interference with Plaintiff's contractual relations with the UH.

143. Plaintiff was qualified for tenure and promotion.

144. Plaintiff's prior work performance had been good.

49

145. But for Defendants' wrongful conduct, Plaintiff's Application for Tenure at the S-4 Rank and Promotion to the S-5 Rank would have been granted.

146. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to recover compensatory, pecuniary, special, and general damages in such amounts as shall be shown at a trial or hearing hereof.

COUNT VII

*INTENTIONAL AND/ OR NEGLIGENT INTERFERENCE WITH*
*PROSPECTIVE ECONOMIC ADVANTAGE*

147. Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

148. Defendants' wrongful conduct constitutes intentional interference with Plaintiff's prospective economic advantage.

149. Plaintiff was qualified for tenure and promotion.

150. Plaintiff's prior work performance had been good.

151. But for Defendants' wrongful conduct, Plaintiff's Application for Tenure at the S-4 Rank and Promotion to the S-5 Rank would have been granted.

152. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to recover compensatory, pecuniary, special, and general damages in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VIII
### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

153. Plaintiff re-alleges and incorporates herein the allegations contained in preceding paragraphs as though fully alleged herein.

154. Defendants' wrongful conduct was intentional.

155. Defendants' wrongful conduct was outrageous, beyond bounds of decency, willful and wanton, and/or malicious.

156. As a result of Employer's wrongful conduct, Plaintiff suffered physical injury and/or a mental condition.

157. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff is entitled to recover special and general damages in such amounts as shall be shown at a trial or hearing hereof.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, jointly and severally, as follows:

A.     Reinstatement and granting Plaintiff tenure and promotion;

B.     Back pay in an amount to be determined at a trial or hearing hereof;

C.     Front pay in an amount to be determined at a trial or hearing hereof;

51

D.   Compensatory damages in an amount to be determined at a trial or hearing hereof;

E.   Actual damages in an amount to be determined at a trial or hearing hereof;

F.   Pecuniary damages in an amount to be determined at a trial or hearing hereof;

G.   Consequential damages in an amount to be determined at a trial or hearing hereof;

H.   Special damages pay in an amount to be determined at a trial or hearing hereof;

I.   General damages in an amount to be determined at a trial or hearing hereof;

J.   Punitive, exemplary, and/or treble damages against Defendant DR. NICHOLS in an amount to be determined at a trial or hearing hereof;

K.   Reasonable attorney's fees and costs;

L.   Prejudgment and post-judgment interest; and

/   /   /

/   /   /

/   /   /

52

M.    Any and all other relief deemed just and equitable by the Court.

DATED:  Honolulu, Hawaii, JUN 2 7 2019 _____.

_____
MICHAEL JAY GREEN
PETER C. HSIEH
Attorneys for Plaintiff
JOSEPH H. CAMPOS, II

53

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH H. CAMPOS II,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF HAWAII, as body corporation, ANDREW W. NICHOLS, M.D., individually and in his official capacity as Director of University Health Services Manoa, JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE GOVERNMENTAL ENTITIES 1-10,<br><br>　　　　　Defendants. | CIVIL NO. _____<br><br>DEMAND FOR JURY TRIAL |

## DEMAND FOR JURY TRIAL

Plaintiff JOSEPH H. CAMPOS II, hereby demands a trial by jury on all issues triable of right by jury in this case, pursuant to Rule 38, Federal Rules of Civil Procedure.

Dated:　Honolulu, Hawaii, _____JUN 2 7 2019_____.

_____
MICHAEL JAY GREEN
PETER C. HSIEH
Attorneys for Plaintiff
JOSEPH H. CAMPOS, II

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH H. CAMPOS II,<br><br>              Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF HAWAII, as body corporation, ANDREW W. NICHOLS, M.D., individually and in his official capacity as Director of University Health Services Manoa, JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE GOVERNMENTAL ENTITIES 1-10,<br><br>              Defendants. | CIVIL NO. _____<br><br>SUMMONS |

<u>SUMMONS</u>

STATE OF HAWAII

To the above-named Defendants:

You are hereby summoned and required to file with the court and serve upon Michael Jay Green and Peter C. Hsieh, Plaintiff's attorneys, whose service address is Davies Pacific Center, 841 Bishop St., Suite 2201, Honolulu, Hawaii 96813, an answer to the Complaint which is herewith served upon you, within 21 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

**WARNING TO DEFENDANT(S):** Failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

**PROCESS SERVER**:   You are prohibited from making personal delivery of this summons between 10:00 p.m. and 6:00 a.m. on premises not open to the public, unless a judge of the district or circuit courts permits, in writing on the summons, personal delivery during those hours.

DATED:  Honolulu, Hawaii, _____.


_____

CLERK OF THE ABOVE-ENTITLED COURT

2